1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## DISTRICT OF NEVADA

10

\* \* \*

11

12

TELECOM ACQUISITIONS CORP., I, LLC, a )
Nevada corporation,                    )
                                       )
13                    Plaintiff,       )
                                       )
14        vs.                          )
                                       )
15  INTERNATIONAL HOUSING              )
    DEVELOPMENT GROUP, CORP., a Florida )
16  corporation; GARNETT & ASSOCIATES,  )
    LLC, an Ohio limited liability company; and )
17  GARNETT R. MEADOR also known as GARY )
    MEADOR, an individual,             )
18                                     )
                      Defendants.      )
19  _____ )
                                       )
20  AND ALL RELATED ACTIONS            )
    _____ )

Case No.: 2:05-cv-727-RLH-PAL

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, and DECISION**

21

22        This matter having come on for trial before the Court on April 7, 8, 9, 10, 22, 23,

23  28, and 29, 2008, the Parties having appeared by and through their respective counsel, and the

24  Court having heard the testimony of witnesses and having considered all exhibits accepted into

25  evidence at trial, the Court now renders its Findings of Facts, Conclusions of Law, and Decision,

26  as follows:

AO 72
(Rev. 8/82)

**FINDINGS OF FACT**

**I.    The Parties**

1.    Telecom Acquisition Corp., I, LLC ("Telecom") is a Nevada corporation that purchases, holds, and transacts business in residential and commercial real estate.  Telecom's President and CEO is Michael Tricarichi, a Las Vegas investor and real estate developer.

2.    Garnett & Associates, LLC ("Garnett") is a real estate development company based in Cleveland, Ohio.  Garnett's managing members are Garnett Meador, an Ohio attorney, and Friendship 2, LLC.  Friendship 2, LLC's sole member is Robb MacMillan.

3.    International Housing Development Group, Corp. ("International Housing") is a real estate development company based in Ft. Lauderdale, Florida.  Patrick Danan and Leonard Mercer were partners and served as officers of International Housing.

**II.    The Surf Towers Project**

4.    In 2004, Garnett secured the rights to purchase several adjoining beachfront parcels of real property in Panama City Beach, Florida.  It intended to assemble the various parcels, raze the existing structures, and construct high-rise condominium towers.  This came to be known as the Surf Towers Project.

5.    The proposed assemblage consisted of three existing condominium complexes, two houses, and a restaurant for a total area of approximately two acres.  The existing condos, houses, and restaurant were owned by approximately fifty individual owners.

6.    After acquiring the rights to the parcels, Garnett began assembling a team to assist in the development project.  It sought partners that could provide financial strength to obtain financing, expertise in developing high-rise condominiums, and cash.

**III.    Search for Development Partners**

7.    In late 2004, Meador contacted Tricarichi, with whom he had worked on a prior real estate development transaction in Arizona, and invited Telecom to become a direct investor in the Surf Towers Project.  Telecom declined the offer.

8.      Near the end of 2004, Meador and MacMillan flew to Las Vegas to meet with Mercer.  Mercer represented that he was the Vice President of International Housing.  They explained to Mercer the nature of the Surf Towers Project and told him that they needed a partner with cash, development expertise, and the ability to obtain financing.

9.      Mercer reacted positively, and the group met together two more times in Las Vegas in late 2004 and early 2005.  Meador and MacMillan also contacted Mercer several times via telephone and traveled to International Housing's office in Ft. Lauderdale, Florida to further discuss the Surf Towers Project.  At the meeting in Ft. Lauderdale, Meador and MacMillan also met with Mercer's partner, Danan, and discussed the Surf Towers Project with him.

10.     In connection with their personal meetings and telephone calls, Garnett and International Housing both conducted due diligence on the project and on their potential business relationship.

11.     During one of the subsequent meetings in Las Vegas, Mercer gave Meador a document identified as International Housing's consolidated financial statement.  The International Housing financial statement was materially false because International Housing did not own the assets attributed to it.  While the financial statement claimed that International Housing had total assets of $91,000,000 and a net worth of approximately $56,000,000, in fact, International Housing's net assets were less than $1,000,000.  The financial statement also listed Danan's and Mercer's personal assets as assets of International Housing.

12.     Mercer and Danan knew that the financial statement was false.  Nevertheless, they used it to obtain financing for their projects and to bolster their credentials with potential business partners.

## IV.    Single Closing Date and Need for a Bridge Loan

13.     During negotiations, Mercer emphasized the importance of having a single closing date on all the properties to prevent later sellers from holding out for more money.  To facilitate a single closing date, Meador negotiated extensions with several of the property owners until May

AO 72
(Rev. 8/82)

12, 2005.  In return for an extension on the closing date, Garnett agreed to pay the individual owners a fee.

14.     Because of tax considerations, six of the owners needed to sell their properties prior to May 12, 2005, to use the proceeds of the sale to acquire replacement properties in an I.R.C. § 1031 exchange.  These owners had already identified the replacement properties and paid deposits on them.  To address the needs of these six property owners, Garnett and International Housing agreed to obtain a bridge loan to purchase the replacement properties for the owners and hold them until the May 12, 2005, closing date.

**V.      Negotiation of the Telecom Agreement**

15.     In February 2005, Garnett again approached Telecom to solicit its involvement in the Surf Towers Project.  Instead of inviting it to participate as an investor, Garnett asked Telecom to purchase the six replacement properties and hold them until May 12, 2005, at which time either the six owners or Garnett would purchase the replacement properties from Telecom.

16.     Telecom responded that it would be willing to participate only if Garnett had a strong net-worth partner for the project and only if that partner also agreed, in writing, to purchase the replacement properties.

17.     Garnett provided International Housing's financial statements to Telecom.  Mercer knew that Garnett transmitted its financials to Telecom for the purpose of obtaining a bridge loan for the replacement properties.

18.     In reliance on the representations made in International Housing's financial statements, Telecom agreed to purchase and hold the replacement properties, thereby acting as the bridge loan lender.

19.     Under the agreement ("Telecom Agreement"), Telecom would receive fifteen percent (15%) interest per annum (0.0411% daily) on the purchase price of each property from the date of purchase to the date of repurchase up to and including May 12, 2005.  Telecom would also receive a payment equal to two percent (2%) of the purchase price of each property (two points).

AO 72
(Rev. 8/82)

1   If the properties were not repurchased by May 12, 2005, the Telecom Agreement provided for an

2   increased interest rate of thirty percent (30%) per annum (0.0822% daily) on the purchase price

3   until the property was sold.  Mercer and Meador were to personally guarantee International

4   Housing and Garnett's obligation to repurchase the replacement properties.

5   **VI.   Signing of Letter of Intent Between Garnett and International Housing**

6        20.     Following extensive negotiations, the input of both Garnett and International

7   Housing, and in reliance on International Housing's financial statements, Meador drafted a Letter

8   of Intent ("LOI") to reduce to writing the understanding of Garnett and International Housing and

9   contractually bind the parties to work together to develop the Surf Towers Project.  Garnett was to

10  perform the hands-on development, and International Housing was to provide architectural support

11  and lend its financial strength to make cash payments and secure financing.

12       21.     On February 25, 2005, Meador and MacMillan traveled to International Housing's

13  offices in Ft. Lauderdale, Florida to sign the LOI.  Meador brought with him the unsigned closing-

14  date extension agreements and the unsigned Telecom Agreement.  Meador, MacMillan, and

15  Mercer used the extension agreements and the Telecom Agreement to prepare Exhibits A and B to

16  the LOI on Meador's laptop.  Exhibit A was the project payment and closing schedule and Exhibit

17  B detailed the project's initial cash needs.  While Exhibit B was not mentioned in the body of the

18  LOI, Meador handwrote a note at the end of the LOI that referenced Exhibit B, which Mercer,

19  MacMillan, and Meador initialed after signing the LOI.

20       22.     The LOI also referenced the Telecom Agreement, which it referred to as a $2.2

21  million bridge loan.  It indicated that Garnett had already arranged the loan at a cost of two (2)

22  points and fifteen percent (15%) annual interest and required Garnett and International Housing to

23  sign the Telecom Agreement by February 28, 2005.

24       23.     The LOI also required International Housing and Garnett to invest $5,000,000 and

25  $50,000 respectively in the Surf Towers Project.  Further, it provided that Garnett was to receive  a

26

AO 72
(Rev. 8/82)

$2,400,000 payment at closing to cover earnest money deposits, actual expenses, brokerage fees, and other costs.

24.     Mercer signed the LOI as Vice President of International Housing and was authorized to sign on behalf of International Housing.  Meador and MacMillan signed on behalf of Garnett.

25.     The LOI was a valid, binding contract.

**VII.     Signing of the Telecom Agreement and Purchase of Replacement Properties**

26.     On February 28, 2005, in breach of the LOI, Mercer failed to sign the Telecom Agreement.  Meador and MacMillan contacted Mercer, who expressed concerns about his risk and cash investment under the LOI.  Meador, MacMillan, and Mercer then discussed a possible addendum to the LOI.

27.     On March 2, 2005, Mercer signed the Telecom Agreement as the Vice President of International Housing, but crossed out his personal guarantee.  At the time, he was authorized to sign on behalf of and did in fact bind International Housing.  He sent the agreement to Meador, who removed Mercer's crossed-out personal guarantee and forwarded the signed agreement to Telecom.

28.     The Telecom Agreement is a valid, binding contract.

29.     Also on March 2, 2005, Mercer and Meador exchanged proposed addendums to the LOI.  Meador's proposed addendum stated that Garnett would use its best efforts to replace International Housing as a partner.  Mercer modified the addendum to require Garnett to replace International Housing as its partner.  The parties never reached an agreement on the addendum.

30.     After receiving the signed Telecom Agreement, Telecom went forward with its obligations to purchase the replacement properties.  It did not object to the removal of Mercer's personal guarantee because it believed that International Housing had net assets of over $50,000,000 based on the representations made in International Housing's financial statements.  Consequently, Telecom purchased:

  i.  6205 Thomas Dr. Unit 2 Bldg. A, Nautical Watch, PCB, FL 32408 ("Nautical Watch") on March 3, 2005, for $381,009.08;

  ii.  4127 Cobia St., PCB, FL 32408 ("Cobia") on March 3, 2005, for $405,808.14;

  iii.  9850 Thomas Dr. Unit 108W, Sunbird Condo PC, FL 32407 ("Sunbird") on March 4, 2005, for $322,140.66;

  iv.  8200 Surf Dr. Unit B-402, Gulfgate Condo PCB, FL 32408 ("Gulfgate") on March 15, 2005, for $404,488.90;

  v.  407 Cheyenne Dr., LaGrange, Garnett 30240 ("LaGrange") on March 17, 2005, for $282,632.95; and

  vi.  30 Moreno Pt. Rd. Unit 105A, Dolphin Point Condo Destin, FL 32541 ("Destin") on March 22, 2005, for $369,391.55.

## VIII. Breach of the LOI and Garnett's Mitigation of Damages

31. International Housing and Garnett continued to renegotiate their agreement, but never signed an addendum to the LOI.  Garnett attempted to obtain a replacement partner for International Housing, but was never wholly successful.  Though it located additional investors, it continued to rely on International Housing for its cash, development expertise, and ability to obtain financing.  Moreover, Mercer continued to give Garnett assurances of his and International Housing's desire to participate in the project.

32. Garnett moved forward on the project, and with Mercer and International Housing's assurances, attempted to finance the purchase of the assemblage.  The total amount of the land acquisition for each of the individual parcels under contract was $22,120,000.  Prior to closing, however, Mercer and International Housing refused to contribute their $5,000,000 as required by the LOI.  As a result, the assemblage failed to close on May 12, 2005.

33. Garnett continued its efforts to close on the assemblage, but the project ultimately failed and Garnett was forced to abandon it.

AO 72
(Rev. 8/82)

34.     An independent appraisal of the assembled value of the land provided that the "as is" market value of the land on May 4, 2005 was $29,600,000.  The total land acquisition profit would have been $7,480,000.

35.     In its efforts to close on the assemblage, Garnett spent $405,000 for earnest money deposits, $112,500 to secure extensions on the Oceana Condominiums, $60,000 to secure extensions on the Stingray Condominiums, $25,000 for the earnest money deposit on the Quarterdeck Oyster Bar, and $368,668 for the purchase of the beach house located at 7905 Surf Drive, Panama City Beach, FL.

**IX.     Breach of the Telecom Agreement and Telecom's Mitigation of Damages**

36.     Garnett, International Housing, and Meador failed to purchase the six replacement properties by May 12, 2005, as required by the Telecom Agreement.  Nor have they purchased or offered to purchase any of the properties since that date.

37.     To mitigate its damages, Telecom sold three of the six properties.  It sold Cobia on July 25, 2005, for $421,005.27; Destin on September 2, 2005, for $386,758.37; and LaGrange on October 27, 2005 for $246,175.02.

38.     It marketed the other three properties for sale but was unable to find a buyer; instead, it rented the properties for a profit.  For Sunbird, Telecom received $32,840.76 in rental income, while expending $21,168.96 to maintain the property; for Nautical Watch, it received $34,684.15 and expended $24,436.70; and for Gulfgate, it received $35,937.35 and expended $29,328.49.

39.     The three unsold properties have depreciated significantly since their purchase in March 2005.  Sunbird's current market value is $187,000; Nautical Watch's is $220,000; and Gulfgate's is $240,000.

40.     Telecom also paid and never recovered the earnest money deposits on four properties: $7,500 on Sunbird, $5,000 on Nautical Watch, $20,000 on Gulfgate, and $1,000 on LaGrange.

AO 72
(Rev. 8/82)

41.     Meador paid Telecom $167,176.11, to settle his personal guarantee on the Telecom Agreement.

**X.     Corporate Form of International Housing**

42.     At all time relevant to this suit, International Housing was influenced and governed by Mercer or Danan.

43.     International Housing never prepared any corporate resolutions, did not have a board of directors, was undercapitalized, never issued stock, and failed to observe any corporate formalities.

44.     Mercer and Danan influenced, governed, dominated, and controlled International Housing to such an extent that International Housing's independent existence was a fiction and Mercer and Danan were the alter ego of International Housing.

45.     There is such a unity of interest and ownership that Mercer, Danan, and International Housing are inseparable from each other.

46.     Mercer and Danan treated the corporate assets as their own and co-mingled their assets with those of International Housing by including their personal assets in International Housing's financial statement.  Moreover, Mercer and Danan used the false financial statement to obtain loans for their projects and to entice potential business partners.

47.     Adherence to the corporate fiction of a International Housing as a separate entity would, under the circumstances of this case, sanction fraud or promote a manifest injustice.

48.     Mercer and Danan used the corporate form fraudulently and for an improper purpose.  This fraudulent and improper use injured Telecom, Garnett, and Meador.

**CONCLUSIONS OF LAW**

**I.     Jurisdiction and Venue**

1.     This Court has original jurisdiction over this matter because "the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs," and the Parties are completely diverse.  28 U.S.C. § 1332.

AO 72
(Rev. 8/82)

2.    Venue is proper in the District of Nevada because the Telecom Agreement contains a valid forum selection clause that provides that "venue shall lie in the county of Telecom's principal place of business in the State of Nevada."  (Pl.'s Trial Ex. 1 ¶ 11.)  *See also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972) (absent some compelling and countervailing reason, a court should honor a forum selection clause made in an arms-length negotiation by experienced and sophisticated businessmen).

## II.    Telecom's Breach of Contract Claim

3.    Nevada has adopted the substantial relationship test to determine choice of law in contract cases.  *Consol. Generator-Nev., Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1253 (Nev. 1998).  "Under this test, the state whose law is applied must have a substantial relationship with the transaction; and the transaction must not violate a strong public policy of Nevada." *Williams v. United Serv. Auto. Ass'n*, 849 P.2d 265, 266 (Nev. 1993).  Courts examine five factors in determining whether a state possesses a substantial relationship: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties.  *Consol. Generator-Nev.*, 971 P.2d at 1253–54; *see also Sotirakis v. United Serv. Auto. Ass'n*, 787 P.2d 788, 790 (Nev. 1990).  But it is also "well settled that parties are permitted to select the law that will govern the validity and effect of their contract." *Engel v. Ernst*, 724 P.2d 215, 216 (Nev. 1986).

4.    Nevada law applies to all claims arising from the Telecom Agreement because the agreement contains a valid choice-of-law clause that states that the "substantive laws of the State of Nevada, excluding application of choice of law, shall govern any dispute arising under this Agreement."  (Pl.'s Trial Ex. 1 ¶ 11.)

5.    The Telecom Agreement is a valid, binding contract that is supported by consideration.  It was accepted by Garnett, Telecom, and International Housing, and personally guaranteed by Meador.

AO 72
(Rev. 8/82)

6.     Telecom fully performed its obligations under the Telecom Agreement.

7.     Garnett and International Housing breached the Telecom Agreement when they failed to repurchase the six replacement properties by May 12, 2005.

8.     Telecom mitigated its damages by selling three of the properties and renting out the other three for a profit.

9.     "In diversity actions brought in federal court a prevailing plaintiff is entitled to pre-judgment interest at state law rates." *In re Cardelucci*, 285 F.3d 1231, 1235 (9th Cir. 2002).  In Nevada, "prejudgment interest is recoverable as a matter of right in actions upon contracts for all money from the time it becomes due." *Schoepe v. Pac. Silver Corp.*, 893 P.2d 388, 389 (Nev. 1995).  To make an appropriate award of prejudgment interest, a court must determine: (1) the rate of interest, (2) the time when it commences to run, and (3) the amount of money to which the rate of interest must be applied." *Id.*

10.    Nev. Rev. Stat. § 99.040(1) affixes the rate of prejudgment interest at "a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1, or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due."  "[T]he date of the transaction for purposes of calculating the rate of prejudgment interest is the original signing of the contract." *Kerala Props., Inc. v. Familian*, 137 P.3d 1146, 1149 (Nev. 2006).  Moreover, once determined, the prejudgment interest rate is fixed; it is not subject to a biannual rate adjustment in January and July. *Id.* at 1150.

11.    On January 1, 2005, the relevant date immediately preceding the signing of the Telecom Agreement, the prime interest rate at the largest bank in Nevada was 5.25%.  Nev. Div. of Fin. Insts., *Prime Interest Rate*, http://fid.state.nv.us/Prime/PrimeInterestRate.pdf.   Thus the prejudgment interest rate for the Telecom Agreement is 7.25%.

12.    For Sunbird, Telecom is entitled to $443,489.43 in damages as follows:

     i.     $322,140.66, representing the purchase price of the property;

1    ii. $6,442.81, representing two percent (2%) of the purchase price;

2    iii. $9,267.06, representing seventy (70) days of non-default interest;

3    iv. $296,810.70, representing 1121 days of default interest through June 6,

4      2008 (the "Judgment Date");

5    v. $7,500, representing the buyer's earnest money deposit;

6    vi. $21,168.96, representing the expenses in maintaining the property;

7    vii. Less $32,840.76, representing the rental income;

8    viii. Less $187,000, representing the current market value of the property.

9   13. For Nautical Watch, Telecom is entitled to $525,550.98 in damages as follows:

10    i. $381,009.98, representing the purchase price of the property;

11    ii. $7,620.20, representing two percent (2%) of the purchase price;

12    iii. $11,117.14, representing seventy-one (71) days of non-default interest;

13    iv. $351,051.11, representing 1121 days of default interest through the

14      Judgment Date;

15    v. $5,000, representing the buyer's earnest money deposit;

16    vi. $24,436.70, representing the expenses in maintaining the property;

17    vii. Less $34,684.15, representing the rental income;

18    viii. Less $220,000, representing the current market value of the property.

19   14. For Gulfgate, Telecom is entitled to $568,461.17 in damages as follows:

20    i. $404,488.90, representing the purchase price of the property;

21    ii. $8,089.78, representing two percent (2%) of the purchase price;

22    iii. $9,807.47, representing fifty-nine (59) days of non-default interest;

23    iv. $372,683.88, representing 1121 days of default interest through the

24      Judgment Date;

25    v. $20,000, representing the buyer's earnest money deposit;

26    vi. $29,328.49, representing the expenses in maintaining the property;

AO 72
(Rev. 8/82)

vii.   Less $35,937.35, representing the rental income;

viii.  Less $240,000, representing the current market value of the property.

15.   For LaGrange, Telecom is entitled to $107,639.32 in damages as follows:

i.    $282,632.95, representing the purchase price of the property;

ii.   $5,652.66, representing two percent (2%) of the purchase price;

iii.  $6,620.58, representing fifty-seven (57) days of non-default interest;

iv.   $39,026.58, representing 168 days of default interest through the sale date of October 27, 2005;

v.    Less $246,175.02, representing the sale proceeds;

vi.   $1,000, representing the buyer's earnest money deposit;

vii.  $2,252.08, representing the expenses in maintaining the property;

viii. $16,629.49, representing 954 days of prejudgment interest on the outstanding balance after the sale ($87,757.75) from the date of sale through the Judgment Date.

16.   For Destin, Telecom is entitled to $30,831.18 in damages as follows:

i.    $369,391.55, representing the purchase price of the property;

ii.   $7,387.83, representing two percent (2%) of the purchase price;

iii.  $7,893.85, representing fifty-two (52) days of non-default interest;

iv.   $34,307.87, representing 113 days of default interest through the sale date of September 2, 2005;

v.    Less $386,758.37, representing the sale proceeds;

vi.   Less $7,849.56, representing the rental proceeds;

vii.  $6,458.01, representing 1009 days of prejudgment interest on the outstanding balance after the sale ($32,222.73) from the date of sale through the Judgment Date.

/ / / /

AO 72
(Rev. 8/82)

17.     For Cobia, Telecom is entitled to $39,755.35 in damages as follows:

      i.     $405,808.14, representing the purchase price of the property;

      ii.    $8,116.16, representing two percent (2%) of the purchase price;

      iii.   $11,840.70, representing seventy-one (71) days of non-default interest;

      iv.   $24,682.03, representing 74 days of default interest through the sale date of July 25, 2005;

      v.    Less $421,005.27, representing the sale proceeds;

      vi.   $4,184.86, representing the expenses in maintaining the property;

      vii.  $6,128.73, representing 1048 days of prejudgment interest on the outstanding balance after the sale ($29,441.77) from the date of sale through the Judgment Date.

18.     In total, Telecom is entitled to $1,715,727.43 in damages.

## III.   Telecom's Fraud Claim

19.     Nevada has recently adopted the Restatement (Second) Conflict of Law's most significant relationship test to determine choice of law in tort actions, unless a more specific section applies to a particular tort.  *Gen. Motors Corp. v. Eighth Judicial Dist. Court*, 134 P.3d 111, 116 (Nev. 2006).  For fraud and misrepresentation, § 148 governs.  It provides that a court should apply the law of the state with the most significant relationship after examining the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) Conflict of Laws § 148.

AO 72
(Rev. 8/82)

20.     Nevada law applies to Telecom's fraud claim because Telecom is a Nevada corporation and it received International Housing's false financial statement in Nevada. Also, International Housing's false financial statements induced Telecom to enter into the Telecom Agreement in Nevada. While the six replacement properties were not located in Nevada, Telecom transacted the purchase of the properties from its Nevada office.

21.     To establish fraud in the inducement, Telecom must prove by clear and convincing evidence that: (1) International Housing made a false representation; (2) International Housing knew that the representation was false; (3) International Housing intended to induce it to enter into the Telecom Agreement with the false representation; (4) it justifiably relied upon the misrepresentation; and (5) it suffered injury because of its reliance on International Housing's misrepresentation. *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004).

22.     International Housing fraudulently induced Telecom to enter into the Telecom Agreement. International Housing submitted false financial statements to Garnett and knew that Garnett forwarded those financial statements to Telecom for the purpose of inducing Telecom to enter into the Telecom Agreement. International Housing knew the financial statements were materially false because they listed Mercer and Danan's personal assets as assets of the corporation. Having received the false financial statements, Telecom justifiably relied on them when entering into the Telecom Agreement, and as a result, has been injured because International Housing failed to repurchase the replacement properties.

23.     "The measure of damages on claims of fraud and breach of contract are often the same." *Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 610 (Nev. 1992). A plaintiff asserting claims for breach of contract and fraud based on the facts surrounding the contract's execution and performance "is not permitted to recover more than her total loss plus any punitive damages assessed." *Id.*

AO 72
(Rev. 8/82)

24.     The breach of contract damages are sufficient to compensate Telecom's losses and to punish and deter International Housing's fraudulent conduct; punitive damages are not warranted.

**V.      Garnett's Breach of Contract and Promissory Estoppel Claims**

25.     Florida law applies to all claims arising from the LOI because Garnett and International Housing entered into the LOI, conducted substantial negotiations, performed, and planned to build the Surf Towers Project in Florida.  Moreover, International Housing is a Florida corporation.

26.     Garnett and International Housing entered into the LOI, which was a valid, binding contract.  While Garnett and International Housing held negotiations about a possible addendum to the LOI, they never signed an addendum and thus the LOI remained in effect.

27.     International Housing breached the LOI by failing to provide $5,000,000 in funding.  As a result of International Housing's breach, the assemblage failed to close. Consequently, Garnett suffered damages and was unable to perform its obligations under the Telecom Agreement.

28.     Breach of contract and promissory estoppel are alternatives of each other.  *Doe v. Univision Television Group, Inc.*, 717 So. 2d 63, 65 (Fla. Dist. Ct. App. 1998).  "The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.  *Id.*

29.     Because Garnett succeeds on its breach of contract claim, its promissory estoppel claim fails.

30.     Garnett is entitled to recover from International Housing:

        i.      $405,000, representing earnest money deposits on the assembled properties;

        ii.     $112,500, representing the money paid to secure extensions on the Oceana Condominiums;

1               iii.     $60,000, representing the money paid to secure extensions on the Stingray

2                        Condominiums;

3               iv.     $25,000, representing the earnest money deposit on the Quarterdeck Oyster

4                        Bar;

5               v.     $368,668, representing the purchase price of the beach house at 7905 Surf

6                        Drive, Panama City Beach, FL;

7               vi.     $1,870,000, representing twenty-five percent (25%) of the total land

8                        acquisition profit.

9       31.     In total, Garnett's damages are $2,841,168.

10  **VII.**    **Garnett's Fraud Claim**

11       32.     Florida law applies to Garnett's fraud and breach of fiduciary duty claims because

12  International Housing's misrepresentation induced Garnett to enter into the LOI in Florida to build

13  the Surf Towers Project in Florida.

14       33.     To prove its claim for fraud, Garnett must show: (1) International Housing

15  misrepresented a material fact; (2) International Housing knew the representation was false; (3)

16  International Housing made the misrepresentation to induce Garnett to rely upon it; (4) Garnett

17  relied on the misrepresentation to his detriment; and (5) Garnett suffered injury because of its

18  reliance.  *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 651 (Fla. Dist. Ct. App. 2006).

19       34.     International Housing fraudulently induced Garnett to enter into the LOI.

20  International Housing misrepresented its financial assets by providing a false financial statement to

21  Garnett.  International Housing knew the financial statement was false and it provided them in

22  order to induce Garnett into entering into the LOI.  Garnett relied on the false financial statement

23  when it chose to enter into the LOI and later the Telecom Agreement.  As a result of the

24  misrepresentation, Garnett suffered injury resulting from the failure of the Surf Towers Project and

25  its breach of the Telecom Agreement.

26

AO 72
(Rev. 8/82)

35.     The breach of contract damages are sufficient to compensate Garnett's losses and to punish and deter International Housing's fraudulent conduct; punitive damages are not warranted.

**VIII.   Garnett's Breach of Fiduciary Duty Claim**

36.     Florida law applies to Garnett's breach of fiduciary duty claims because International Housing's breached its fiduciary duties in connection with the LOI, which was signed in Florida, and the Surf Towers Project, which was to be built in Florida.

37.     To prove its claim for breach of fiduciary duty, Garnett must show that (1) International Housing had a fiduciary duty to Garnett arising from their fiduciary relationship, (2) International Housing breached that duty such that it is the proximate cause of Garnett's damages. *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. Dist. Ct. App. 2007).  "A fiduciary relationship is based on trust and confidence between the parties where confidence is reposed by one party and a trust accepted by the other."  *Mac-Gray Servs., Inc. v. DeGeorge*, 913 So. 2d 630, 633 (Fla. Dist. Ct. App. 2005) (quotations omitted).

38.     Garnett and International Housing's execution of the LOI formed a partnership, which created fiduciary duties between Garnett and International Housing.  As such, International Housing had a duty of good faith and fair dealing towards Garnett with respect to the Surf Towers Project.  International Housing breached its fiduciary duties to Garnett by failing to perform its obligations under the LOI, including its refusal to perform under the Telecom Agreement.

39.     The breach of contract damages are sufficient to compensate Garnett's losses and to punish and deter International Housing's improper conduct; punitive damages are not warranted.

**IX.   Garnett's Specific Performance Claim**

40.     Garnett abandoned its claim for specific performance.

**X.   Garnett's Contribution and Indemnity Claim**

41.     For contribution and indemnity, a court examines which state has the most significant relationship to the occurrence, taking into consideration: (a) the place where the injury

AO 72
(Rev. 8/82)

occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  Restatement (Second) Conflict of Laws § 145.

42.     Florida law applies to Garnett's contribution and indemnity claim because International Housing is a Florida corporation, International Housing and Garnett entered into a business partnership in Florida to develop condominiums in Florida, and International Housing failed to fund the Florida condominium project and repurchase the replacement properties, five of which were in Florida.

43.     Indemnity is a right that inures to a person who discharges a duty that the person owes but which, as between the person and another, should have been discharged by the other. *Stuart v. Hertz Corp.*, 351 So. 2d 703, 705 (Fla. 1977) (citing 41 Am. Jur. 2d *Indemnity* § 1).  "It shifts the entire loss from one who, although without fault, has been obligated to pay because of some vicarious, constructive, derivative, or technical liability to another who should bear the costs because it was the latter's wrongdoing for which the former is held liable."  *Horowitz v. Laske*, 855 So. 2d 169, 174 (Fla. Dist. Ct. App. 2003).  "For the right to indemnification to arise, there must be a special relationship between the parties that gives rise to the technical liability of the would-be indemnitee."  *Id.*

44.     Garnett and Meador are entitled to indemnity from International Housing, Mercer, and Danan for all damages they are obligated to pay to Telecom arising out of their breach of the Telecom Agreement.

**XI.     Settlement of Meador's Personal Guarantee of the Telecom Agreement**

45.     Meador's payment of $167,176.11 to settle his personal guarantee on the Telecom Agreement is reasonable and was made in good faith.

**XII.     International Housing's Contribution and Indemnity Claim**

46.     Like Garnett's claim for contribution and indemnity, Florida law applies to International Housing's claim because they are based upon the same facts.

AO 72
(Rev. 8/82)

47.     International Housing failed to prove that it is entitled to either contribution or indemnity from Garnett or Meador.

**XIII.   Piercing the Corporate Veil**

48.     Under Nevada law, a shareholder, director, or officer is considered the alter ego of a corporation if (1) the shareholder, director, or officer influences and governs the corporation; (2) there is such a unity of interest and ownership that the shareholder, director, or officer and the corporation are inseparable from each other; and (3) adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote a manifest injustice. Nev. Rev. Stat. § 78.747; *LFC Mktg. Group, Inc. v. Loomis*, 8 P.3d 841, 846–47 (Nev. 2000).

49.     Under Florida law, a court will pierce the corporate veil and hold a shareholder personally liable if (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholder was in fact the alter ego of the corporation; (2) the shareholder used the corporate form fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form injured the claimant. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008).

50.     Telecom, Garnett, and Meador have proven by a preponderance of the evidence, under both Florida and Nevada law, that Danan and Mercer are the alter ego of International Housing.  Accordingly, Mercer and Danan and are personally liable for the debts of International Housing arising from this lawsuit.

If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

**DECISION**

Based upon the foregoing, it is the decision of the Court that Telecom have judgment against International Housing, Garnett, Mercer, Danan, and Meador, for which they are jointly and severally obligated, in the amount of $1,713,847.30.  Garnett and Meador are entitled to indemnity against International Housing, Mercer, and Danan in connection with this judgment.

AO 72
(Rev. 8/82)

1            Further, it is the decision of the Court that Garnett and Meador have judgment

2    against Mercer, Danan, and International Housing, for which they are jointly and severally

3    obligated, in the amount of $2,841,168.

4

5            Dated: June 6, 2008.

6

7                                  _____

8                                  **ROGER L. HUNT**
                                   **Chief United States District Judge**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26